Colin D. Dailey (SBN 293942)
colin.dailey@bclplaw.com
David J. Root (SBN 307251)
david.root@bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
120 Broadway, Suite 300
Santa Monica, California 90401-2386
Telephone: (310) 576-2128
Facsimile: (310) 576-2200

Daniel A. Crowe (*pro hac vice*)
dan.crowe@bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone: (314) 259-2619

Attorneys for Plaintiff Puff Corp.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Puff Corp., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SHO Products, LLC, a New York limited liability company; and MasterMinded, Inc., a California Corporation,<br><br>Defendants. | Case No. 2:22-cv-02008-GW-KS<br><br>**PUFF CORP.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Filed concurrently with Declaration of Colin D. Dailey; Statement of Uncontroverted Facts; [Proposed] Order]<br><br>Judge:  Hon. George H. Wu |
| SHO Products, LLC, a New York limited liability company; and MasterMinded, Inc., a California Corporation,<br><br>Counterclaimants,<br><br>vs.<br><br>Puff Corp., a Delaware corporation,<br><br>Counterdefendant | Date:  April 4, 2024<br>Time:  8:30 a.m.<br>Courtroom:  9D, 98th Floor<br>            United States Courthouse<br>            350 West 1st Street<br>            Los Angeles, CA  90012<br><br>Action Filed:  March 29, 2022<br>Trial Date: June 18, 2024 |

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 4, 2024, at 8:30 a.m. in Courtroom 9D, 9th Floor, United States Courthouse, 350 West 1st Street, Los Angeles, CA, 90012, the Honorable District Judge George H. Wu presiding, Plaintiff and Counterdefendant Puff Corp. ("Puffco") will, and hereby does, move the Court for partial summary judgment on Puffco's Complaint (Doc. 1) and Defendants and Counterclaimants SHO Products, LLC and MasterMinded, Inc.'s Amended Counterclaims (Doc. 29) as follows:

(1)     The accused Focus V Carta category of devices (including those devices variously identified by Defendants as the Carta, the Carta OG, and the Carta Classic, collectively the "Carta OG"), sold by Defendants, infringes claims 1-11 and 13 of Puffco's U.S. Patent No. 10,517,334 ("the '334 Patent");

(2)     The accused Focus V Carta 2 category of devices, sold by Defendants, infringes claims 1-11 and 13 of the '334 Patent;

(3)     The accused KandyPens Oura devices, sold by Defendants, infringe claims 1-11 and 13 of the '334 Patent;

(4)     The asserted claims of the '334 Patent are not invalid based on the Puffco Peak prototypes taken to the Las Vegas Pepcom event in January 2018 and related allegedly public use incidents because Defendants cannot meet their high burden to show by clear and convincing evidence that such prototypes included the required element of a removable atomizer, particularly when all available evidence demonstrates they did not; and

(5) The asserted claims of the '334 Patent are not invalid as anticipated by Kane U.S. Patent No. 10,321,714 ("Kane") as Kane fails to disclose a gas flow path conduit through its base or a heating element as part of its atomizer.

This Motion is made pursuant to Federal Rule of Civil Procedure 56 on the grounds that there is no genuine dispute as to any material fact regarding

infringement and certain of the Defendants' invalidity theories, and Puffco is entitled to summary judgment on these issues.

This Motion is based on this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the accompanying Declaration of Colin D. Dailey; the Statement of Uncontroverted Facts; Proposed Order; the pleadings, records, and papers filed herein; and all other matters that the Court may consider, including the oral argument of counsel.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on January 14, 2024.  (Declaration of Colin Dailey in support hereof, ¶ 2.)

Dated:  February 8, 2024          **BRYAN CAVE LEIGHTON PAISNER LLP**

By:  *Colin D. Dailey*
Colin D. Dailey
**Attorneys for Defendant and Counterclaimant Puff Corp.**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   RELEVANT FACTUAL BACKGROUND ......................................... 2

    A.   Puffco's "Revolutionary" Invention "Changed the World of Concentrates" ............................................................................. 2

    B.   The '334 Patent ..................................................................... 4

    C.   The Court's Claim Construction Order ................................... 6

    D.   The Accused Devices ............................................................. 6

    E.   Defendants' Two Anticipation Theories ................................. 7

III.  LEGAL STANDARDS ...................................................................... 7

    A.   Summary Judgment Standards ............................................... 7

    B.   Patent Infringement ............................................................... 7

    C.   Defendants' High Burden to Prove Patent Invalidity ............ 8

IV.  THERE IS NO TRIABLE ISSUE AS TO WHETHER THE ACCUSED DEVICEs INFRINGE ................................................... 9

    A.   The Carta OG Contains All Limitations of the Asserted Claims ................................................................................... 9

    B.   The Carta 2 Contains All Limitations of the Asserted Claims, Including a "Heating Element" Under the Court's Construction ......................................................................... 9

        1.   The Ceramic Bottom of the Container Constitutes a Heating Element. ...................................................... 11

        2.   The Metal Traces in the Container Bottom Constitute a Heating Element. ................................... 13

        3.   The Carta 2 Container is Equivalent to a Heating Element. ...... 13

        4.   The Carta 2 Infringes Claim 7. ................................... 14

C.    The Oura Contains All Limitations, Including a Heating
       Element ...........................................................................................14

D.    The Carta 2 and the Oura have a heating element under a
       revised Court construction. ...........................................................15

V.    PUFFCO IS ENTITLED TO SUMMARY JUDGMENT ON
       DEFENDANTS' ANTICIPATION THEORIES...........................................16

A.    Defendants Lack Evidence to Meet Their Burden of Proving
       the "Claimed Invention" was in Public Use Before January
       14, 2018...........................................................................................16

B.    Kane Does Not Anticipate the Asserted Claims.................................20

       1.    Kane Does Not Disclose a Gas Flow Path Conduit. .................22

       2.    Kane Does Not Disclose a Heating Element............................23

       3.    Kane Does Not Disclose a "Mouthpiece that is Removably
              Attachable to the Base" ..............................................................25

VI.   CONCLUSION .............................................................................................26

1

# <u>TABLE OF AUTHORITIES</u>

2

3

**Page(s)**

4

**Cases**

5

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................... 7

6

7

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
    2012 WL 2576136 (N.D. Cal. July 3, 2012) ..................................... 18

8

9

*C.A.R. Trans. Brokerage v. Darden*,
    213 F.3d 474 ............................................................................................. 7

10

11

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................... 7

12

13

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
    145 F.3d 1303 (Fed. Cir. 1998) ........................................................ 13

14

15

*Connell v. Sears, Roebuck & Co.*,
    722 F.2d 1542 (Fed. Cir. 1983) .......................................................... 8

16

17

*Diodem, LLC v. Lumenis Inc.*,
    2005 WL 6225366 (C.D. Cal. Jan. 24, 2005) .................................. 9

18

19

*Dorel Juvenile Group, Inc. v. Graco Children's Prods., Inc.*,
    429 F.3d 1043 (Fed. Cir. 2005) ....................................................... 20

20

*Gart v. Logitech, Inc.*,
    254 F.3d 1334 (Fed. Cir. 2001) .......................................................... 8

21

22

*Genentech, Inc. v. Chiron Corp.*,
    112 F.3d 495 (Fed. Cir. 1997) ......................................................... 12

23

24

*High Tech Med. Instrumentation, Inc v. New Image Indus., Inc.*,
    49 F.3d 1551 (Fed. Cir. 1995) ......................................................... 19

25

26

*IMS Tech, Inc. v. Haas Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000) ....................................................... 13

27

28

*Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*,
    271 F. Supp. 3d 667 (D. Del. 2017), *aff'd sub nom. Int'l Bus.
    Machines Corp. v. Booking Holdings Inc.*, 775 F. App'x 674 (Fed.
    Cir. 2019) ................................................................................................ 7

*Little Giant Pump Co. v. Diversitech Corp.*,
    505 F. Supp. 2d 1107 (W.D. Okla. 2007) ........................................... 20

*Microsoft Corp. v. i4i Ltd.*,
    131 S.Ct. 2238 (2011) ............................................................................ 8

*Neonatal Prod. Grp., Inc. v. Shields*,
    2016 WL 1746788 (D. Kan. May 3, 2016) ......................................... 20

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) .......................................................... 21

*Prolitec Inc. v. ScentAir Techs., LLC*,
    2023 WL 8697973 (D. Del. Dec. 13, 2023) ........................... 20, 21, 22

*Ring & Pinion Serv. Inc. v. ARB Corp.*,
    743 F.3d 831 (Fed. Cir. 2014) ............................................................ 14

*In re Robertson*,
    169 F.3d 743 (Fed. Cir. 1999) ............................................................ 18

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics,
    Inc.*,
    637 F.3d 1269 (Fed. Cir. 2011) ............................................................ 8

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) ............................................................ 7

*Tech. Consumer Prod., Inc. v. Lighting Sci. Grp. Corp.*,
    955 F.3d 16 (Fed. Cir. 2020) .............................................................. 12

*TEK Glob., S.R.L. v. Sealant Sys. Int'l*,
    920 F.3d 777 (Fed. Cir. 2019) .............................................................. 7

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    593 F.3d 1325 (Fed. Cir. 2010) ............................................................ 8

**Statutes**

35 U.S.C. §102 ......................................................................................................... 7, 8

35 U.S.C. § 112(f) ................................................................................................. 6, 8, 13

35 U.S.C. § 282 ............................................................................................................... 8

**Other Authorities**

N.D. Cal. PLR 3-3 ......................................................................................................... 22

Fed. R. Civ. P. Rule 56 ................................................................................................... 7

Fed. R. Civ. P. 56(c) ....................................................................................................... 7

U.S. Patent No. 10,321,714 ......................................................................................... 1, 7

U.S. Patent No. 10,517,334 .................................................................................. *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiff Puff Corp. ("Puffco") seeks partial summary judgment that the three accused devices in this action (the Carta OG, the Carta 2, and the Oura) sold by Defendants SHO Products, LLC ("SHO") and MasterMinded, Inc. ("MasterMinded") (collectively, "Defendants") infringe claims 1-11 and 13 of Puffco's U.S. Patent No. 10,517,334 ("the '334 Patent").  Defendants conceded in verified discovery responses that the Carta OG contains each limitation of each asserted claim, yet refused to stipulate that the Carta OG infringes Puffco's patent.  As to the Carta 2 and the Oura, the only claim limitation that Defendants dispute is whether each device contains a "heating element."  There is no genuine dispute of fact on this issue.  First, these devices contain a "heating element" as that term was construed by the Court, namely "a metal or ceramic plate attached to conductive elements such as wires" in order to achieve the function of "heating the vaporizable product"  Second, if the Court grants Puffco's co-pending motion to amend the claim construction of "heating element" based on new evidence recently obtained from Defendants, there is no dispute these devices contain a heating element under Puffco's proposed construction and/or a plain and ordinary meaning.

Puffco also seeks partial summary judgment on Defendants' invalidity defenses related to alleged public use or anticipation by Kane U.S. Patent No. 10,321,714 ("Kane").  Defendants intend to argue that the two prototypes that Puffco took to a Pepcom event in Las Vegas in January 2018 ("Pepcom Prototypes") or depicted in social media videos around that same time constitute invalidating public use.  However, the '334 Patent is presumed valid, and Defendants cannot overcome this presumption without admissible "clear and convincing evidence" that "the claimed invention" itself, including each limitation therein combined in the same way as recited in the patent claim, was in public use

or identically disclosed in a single prior art reference before the critical date of January 14, 2018.  Defendants lack any evidence at all, let alone clear and convincing evidence, that the display of the Pepcom Prototypes constitute invalidating public use.  All available evidence in the case shows the Pepcom Prototypes did not contain at least one limitation (a removably attachable atomizer) and possibly others, and Defendants have no evidence showing otherwise.  They would merely be asking the jury to speculate, and therefore they cannot possibly meet the heightened burden of clear and convincing evidence required to invalidate a patent.  Finally, Kane does not disclose several limitations of each asserted claim combined in the same way as recited in the patent claim, including: (i) a gas flow path conduit; or (ii) a heating element; and (iii) a removably attachable mouthpiece.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Puffco's "Revolutionary" Invention "Changed the World of Concentrates"

The term "dabbing" generally refers to a process for consuming cannabis concentrates (often in wax form) by vaporization, rather than combustion.  A traditional dabbing rig is a water pipe used to inhale concentrates. The process involves heating a "nail" (a container) with a butane torch, then placing cannabis concentrate into the nail and inhaling the resultant vapor through an attached mouthpiece.

In late 2017 and throughout 2018, virtually every dabbing device on the market at the time of Puffco's invention generally used either (1) a glass water pipe (no base containing electronics or battery) where the nail is heated by a torch or separate electronic component, *or* (2) a battery-powered "pen-shaped" form utilizing a rudimentary heating tray (taking the place of the "nail") and designed to direct the vapor *upward* into a mouthpiece, keeping the vapor and liquid residue away from any electronics in the base.  For example:

1

2

3

4

5

6

7    (1)




8              Dab Rig with Butane Torch                    "Electronic Nail"

9

10

11

12



13

14

15

16

17

18

19

20    (2)                    The "Dr. Dabber Boost" (battery powered)

21

22        In the Spring of 2018, Puffco began selling a groundbreaking vaporizing

device named the Puffco Peak.  For this industry and consumer base, the

introduction of the Peak was nothing short of "revolutionary," it "changed the world

of concentrates," and ushered in the "future of dabbing."[1]

25

26

27    ---

[1]     https://weedmaps.com/news/2021/07/behind-the-quest-for-the-perfect-dab/ ("The Peak is the perfect example

28    of a lightning rod invention that *changed the world* of concentrates"); https://marketbusinessnews.com/everything-
you-need-to-know-about-peak-atomizers-the-ultimate-guide/346356/ ("This groundbreaking device has *revolutionized*

3

**B.    The '334 Patent**

On January 14, 2019, Puffco applied to the United States Patent and

Trademark Office ("PTO") to obtain patent protection over its invention.  (Doc. 1-1

["'334 Pat."].)

On December 31, 2019, the PTO issued the '334 Patent to Puffco.  (*Id*.)

Claim 1 of the '334 Patent recites, in relevant part:

1. A portable electronic vaporizing device comprising:
    ***a base having a gas flow path conduit therein*** and a housing for one or
       more components for electrically connecting to a power source
       and/or controlling the device, ***the gas flow path conduit
       comprising a conduit inlet and a conduit outlet***;
a mouthpiece that is removably attachable to the base, the mouthpiece
       comprising:
[…]; and
an atomizer that is removably attachable to the base, the atomizer
       comprising:
[…]
a container within the atomizer housing that is capable of holding a
       vaporizable product,
a ***heating element capable of heating the vaporizable product held in
       the container, the heating element being configured to be
       electrically connected to the one or more components for
       electrically connecting to the power source and/or controlling
       the device that are housed in the base***;
[…],
***wherein the flow of gas having the vaporizable product entrained
       therein flows from the atomizer internal flow path and through
       the gas flow conduit inlet of the base to the mouthpiece inlet***,
       and along the mouthpiece internal flow path to the inhalation
       outlet.

(*Id*. at 13:56-14:35, emphasis added.)

Figures 2 and 3 in the '334 Patent depict a covered device containing the

novel combination of elements and novel airflow path:

---

the way enthusiasts consume concentrates"); https://hightimes.com/products/review-puffco-peak-promises-great-dabs-modern-package/ ("the future of dabbing has arrived").



FIG. 2

FIG. 3

The patented features provide significant advantages over prior portable electronic devices in terms of usability, durability, and overall user experience. As explained by *Defendants'* technical expert:

> The portable electronic vaporizing device as claimed provides significant advantages in terms of usability, durability, and overall user experience, over prior portable electronic devices. For example, the separately removably attachable nature of both the mouthpiece and atomizer allows for easy cleaning, refilling and/or repair or replacement of these components. ('334 Pat., at 3:42-65) As a further example, the configuration of the gas flow path through the atomizer and to the mouthpiece that proceeds via flow through the base, such that the mouthpiece flow path and atomizer flow path are separated from one another by the gas flow conduit in the base, also advantageously facilitates a configuration in which the mouthpiece and atomizer are removably attachable independently from one another. […] This allows the atomizer and/or mouthpiece to be accessed separately from one another, and without requiring dismantling of both components from the device whenever a user seeks to refill the device with vaporizable product and/or water, or seeks to clean or repair the device. ('334 Pat., at 3:42-4:8)

(Dailey-Decl., Ex. G, Kodama Non-Infringement Report, ¶ 47.)

C.    **The Court's Claim Construction Order**

On March 3, 2023, the Court issued its claim construction order.  (Doc. 65.)  Relevant here, the Court construed the term "heating element" as a means-plus-function term under 35 U.S.C. § 112(f), identified the function as "heating the vaporizable product" and identified the corresponding structure as "a metal or ceramic plate attached to conductive elements, such as wires."  (*Id*., at 26.)

Further, the Court construed the term "base having a gas flow path conduit therein" to mean "a base having a channel through which gas may flow."  (Doc. 65, at 9-10.)

D.    **The Accused Devices**

Defendants sell three accused devices:





*Focus V Carta OG*          *Focus V Carta 2*                    *KandyPens Oura*

(Puffco Statement of Uncontroverted Facts ["SUF"], ¶¶ 4-9.)  As shown in the expert report of Puffco's technical expert Harold J. Walbrink, each accused device utilizes Puffco's invention of having an atomizer that is removably attachable to the base independently of the removably attachable mouthpiece, an atomizer having a heating element and an internal air flow path directing the vapor into the base, a gas flow path in the base, and other requirements of the '334 Patent.  (SUF, ¶¶ 10, 11, and 42.)

### E.    Defendants' Two Anticipation Theories

Defendants assert that the claims of the '334 Patent are invalid under 35 U.S.C. §102 as anticipated by: (i) alleged public use of the claimed invention; and (ii) Kane U.S. Patent No. 10,321,714 ("Kane").

## III.    LEGAL STANDARDS

### A.    Summary Judgment Standards

"A grant of summary judgment under Rule 56, Fed. R. Civ. P., is entirely appropriate, in a patent as in any other case, where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985).  The party moving for summary judgment bears the initial burden of demonstrating that there are "no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once this initial burden is met, the burden then shifts to the other party to "designate 'specific facts' showing that there is a genuine issue for trial" in order to avoid summary judgment. *Celotex*, 477 U.S. at 324.  "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'"  *C.A.R. Trans. Brokerage v. Darden*, 213 F.3d 474, 480 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). Lack of clear and convincing evidence of anticipation under 35 U.S.C. 102 is a basis for granting summary judgment to the patent owner.  *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 681 (D. Del. 2017), *aff'd sub nom. Int'l Bus. Machines Corp. v. Booking Holdings Inc.*, 775 F. App'x 674 (Fed. Cir. 2019) (granting summary judgment of no anticipation by public use).

### B.    Patent Infringement

"An accused product infringes a claim if it embodies each claim element or its equivalent." *TEK Glob., S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 784 (Fed. Cir.

2019).  "An infringement issue is properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents."  *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001) (citation omitted).  The patentee must prove infringement by a preponderance of the evidence.  *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011).

A means-plus-function term "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f).

### C.    Defendants' High Burden to Prove Patent Invalidity

An issued patent is presumed valid.  35 U.S.C. § 282.  Overcoming this presumption requires clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd.*, 131 S.Ct. 2238 (2011).

A party may show that a claim is invalid by showing that "the claimed invention" was in public use or disclosed by prior art before the critical date.  35 U.S.C. § 102.  A party asserting that a claim was anticipated must show that a single reference disclosed every claim limitation arranged or combined in the same way as recited in the claim.  *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332-33 (Fed. Cir. 2010).  To establish anticipation, "every limitation of a claim must identically appear in a single prior art reference for it to anticipate the claim." *Id.* (emphasis in original) (citing *Gechter v. Davidson*, 116 F.3d 1454, 1457 (Fed. Cir. 1997)).

Anticipation cannot be proven by combining two or more references.  *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("Anticipation requires the presence in a single prior art disclosure of all elements of a claimed

invention arranged as in the claim."); *Diodem, LLC v. Lumenis Inc.*, 2005 WL 6225366, at *16 (C.D. Cal. Jan. 24, 2005).

## IV.    THERE IS NO TRIABLE ISSUE AS TO WHETHER THE ACCUSED DEVICES INFRINGE

### A.    The Carta OG Contains All Limitations of the Asserted Claims

The Carta OG contains each element of, and therefore infringes, Claims 1-11 and 13. (SUF, ¶ 10.)  This has been established in Mr. Walbrink's report, and Defendants have conceded the same in verified interrogatory responses containing Defendants' non-infringement contentions.  (*Id*.)

### B.    The Carta 2 Contains All Limitations of the Asserted Claims, Including a "Heating Element" Under the Court's Construction

Puffco's expert established that the accused Carta 2 contains each element of Claims 1-11 and 13. (SUF, ¶ 11.)

Defendants conceded in their non-infringement interrogatory responses that the Carta 2 contains each element of the asserted claims, except that Defendants disagree that the Carta 2 has a "heating element" under the Court's construction. (SUF, ¶ 12.)  As shown below, there is no genuine dispute of fact that the Carta 2 has a "heating element" under the Court's current construction or the construction proposed by Puffco in its co-pending motion to amend claim construction.

Claim 1 requires an atomizer comprising "a ***heating element*** capable of heating the vaporizable product held in the container, the ***heating element*** being configured to be electrically connected to the one or more components for electrically connecting to the power source and/or controlling the device that are housed in the base."

The Carta 2 contains a removably attachable atomizer.  (SUF, ¶ 13.)  The atomizer includes a ceramic container used for heating the vaporizable product. (SUF, ¶ 14.)  The container has a cylindrical sidewall and a flat bottom.  (SUF, ¶¶

15-16.)  The container includes flat metallic electrical traces embedded within the flat bottom of the container and the sidewall as shown in the photograph below.




(SUF, ¶¶ 17-18.)  These embedded metal traces are also illustrated in a technical document prepared by the manufacturer of the Carta 2:

[IMAGE REDACTED – SUBMITTED WITH APPLICATION TO SEAL]



(Dailey-Decl., Ex. H,; SUF, ¶¶ 15, 17-18.)  The manufacturer identifies the metal heating traces in the sidewall as a "heating element" and identifies the metal heating traces in the bottom as a second "heating element."  (SUF, ¶¶ 22-23.)

The embedded metal traces are attached to conductive elements (wires). (SUF, ¶¶ 19, 30.)  The wires are also electrically connected to a PCB in the base so that the traces may receive electrical power from a battery.  (SUF, ¶ 20.) Connecting these conductive elements to the battery causes the metal traces to heat up, which in turn heats up both the bottom and sidewalls of the container by conduction for the purpose of heating vaporizable product placed in the container. (SUF, ¶ 21.)  Defendants described it as follows: "The Carta 2 uses, as its component that heats the vaporizable product, a ceramic bowl […] with resistive heating components embedded around the [sidewall] of the bowl and in the bottom of the bowl." (Dailey-Decl., Ex. D, Interrogatory 9, at p. 9.)

**1.    The Ceramic Bottom of the Container Constitutes a Heating Element.**

The flat bottom of the ceramic container (depicted above) is a ceramic plate attached to conductive elements and literally meets the Court's construction of "heating element."  (Dailey-Decl., Ex. A, at pp 72-73.)

The bottom is formed from ceramic (SUF, ¶¶ 14, 28), it contains flat metal heating traces attached to conductive elements (SUF, ¶ 19), it is in the shape of a

plate, here a flat, round disk (SUF, ¶¶ 27-29), and serves the function of heating the vaporizable product held in the container (SUF, ¶ 32). Defendants' technical expert Mr. Hatton, agrees that "the bottom portion of the Carta 2's heating container is plate-like and heated during operation." (SUF, ¶ 28.) He also testified that "a heating element could be a piece of ceramic with a heating trace embedded in it." (SUF, ¶ 29.)

Defendants do not challenge the fact that the bottom of the container is a ceramic plate attached to conductive elements and that the bottom plate alone can heat the vaporizable product within the container. (SUF, ¶¶ 29-32.) Instead, Defendants argue that the Court should only assess whether the *entire* container, *i.e.*, the bottom and sidewalls, meets the construction. This argument fails for at least two reasons.

First, this is not the law, as the addition of non-infringing elements to an otherwise infringing device does not negate infringement. *Tech. Consumer Prod., Inc. v. Lighting Sci. Grp. Corp.*, 955 F.3d 16, 22 (Fed. Cir. 2020) (use of "comprising" suggests "there may be additional, unclaimed elements in the device, including additional heat sinks"); *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 499 (Fed. Cir. 1997). Thus, the addition of heating traces in the sidewall does not change the fact that the bottom of the container alone meets the construction. Defendants' position is that one could copy the Puffco Peak exactly but add a second heating element somewhere in the device and avoid infringement, which is contrary to law.

Second, the bottom and the sidewall of the container are formed separately and then attached to form the container. (SUF, ¶ 26.) The manufacturer's technical document describes that the heating traces in the bottom of the container have a higher resistance than the heating traces within the sidewall, further showing that the bottom of the container is a separate component from the sidewall. (SUF, ¶¶ 22-26.)

SHO lacks evidence to the contrary, as its own witnesses admitted having no knowledge how the container is formed.  (SUF, ¶ 26.)

### 2.    The Metal Traces in the Container Bottom Constitute a Heating Element.

In addition, the flat metal traces embedded within the container bottom meet the Court's construction.  (SUF, ¶¶ 34-37.)  The traces are formed from metal into a flat plate structure and are attached to wires.  (SUF, ¶¶ 33-37.)  Both parties' experts agreed that the industry commonly uses the term "plate" to refer to heating elements formed of metal traces.  (SUF, ¶ 34.)

### 3.    The Carta 2 Container is Equivalent to a Heating Element.

Where a claim term is construed as a means-plus-function term, "the claim shall be construed to cover the corresponding structure, material, or acts described in the specification *and equivalents thereof*."  35 U.S.C. § 112(f) (emphasis added).  In addition to the arguments above, the "embedded-heating-trace container" of the Carta 2, as described by Defendants, is equivalent to "a metal or ceramic plate attached to conductive elements, such as wires."

One test for determining whether the "embedded-heating-trace container" in the accused device is equivalent to the structure disclosed in the specification is to assess whether the two structures perform the same function in substantially the same way to achieve substantially the same result.  *IMS Tech, Inc. v. Haas Automation, Inc*., 206 F.3d 1422, 1435, 1437 (Fed. Cir. 2000).  Another version of this test asks whether the differences are insubstantial.  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1309 (Fed. Cir. 1998).

There is no factual dispute on this issue.  Both parties agree that the ***function*** of both structures, *i.e*., the metal or ceramic plate described in the '334 Patent, and the so-called "embedded-heating-trace container" of the Carta 2 device is identical – to heat the vaporizable material within the atomizer.  (SUF, ¶¶ 36-38.)  Both

structures accomplish this function in the same *way*.  In both structures, conductive
elements carry electrical energy to the plate or container and the elements
conductively heat the ceramic or metal structure via resistive heating.  (SUF, ¶ 37.)
Finally, both structures achieve the same *result*, *i.e.*, vaporization of product placed
within the container.  (SUF, ¶¶ 14-15, 19, 40-41.)

Puffco has also established equivalency by demonstrating that one of ordinary
skill in the art would have known the use of embedded heating traces as in the Carta
2 was interchangeable with the structure described in the '334 Patent and there are
no substantial differences between the two structures.  (SUF, ¶ 38.) *Ring & Pinion
Serv. Inc. v. ARB Corp.*, 743 F.3d 831, 834 (Fed. Cir. 2014).

### 4.    The Carta 2 Infringes Claim 7.

Claim 7 depends from claim 1 and adds the additional limitation that the
"heating element [be] disposed below a bottom surface of the container that [is]
adapted to receive the vaporizable product."  The "surface" of the container that is
adapted to receive the vaporizable product is the container bottom's interior surface
(where the concentrate is placed).  As shown above, both the ceramic bottom of the
container and the metal traces embedded therein meet the Court's construction of
heating element, and both are disposed below the above-referenced bottom surface
of the container that is adapted to receive the vaporizable product.  (SUF, ¶ 39.)

### C.    <u>The Oura Contains All Limitations, Including a Heating Element</u>

Puffco's expert established that the accused Oura contains each element of
Claims 1-11 and 13. (SUF, ¶ 42.)

Defendants conceded in verified discovery responses that the Oura contains
each element of the asserted claims except for "heating element."  (SUF, ¶ 43.)
However, the Oura has a heating element in the form of a flat metal coil that sits
below the container as shown below.

(SUF, ¶¶ 44-46.) Mr. Walbrink's report establishes the coil heating element in the Oura meets the Court's construction of "a metal or ceramic plate attached to conductive elements, such as wires" because it is formed from metal, attached to conductive elements, performs the function of heating vaporizable material, and is in the form of a flat plate structure. (SUF, ¶¶ 44-49.) As Defendants' expert agrees, a flat metal coil is considered a plate heating element. (SUF, ¶¶ 50-51.)

Moreover, the Oura's heating coil is equivalent to "a metal or ceramic plate attached to conductive elements, such as wires." The heating coil performs the same function, in the same way, to achieve the same result as a metal plate, and any differences can only be described as insubstantial. (SUF, ¶ 52.)

Thus, there is no genuine dispute of fact that the Oura infringes the '334 Patent under the Court's construction of "heating element."

**D.** **The Carta 2 and the Oura have a heating element under a revised Court construction.**

In the event that the Court grants Puffco's co-pending Motion to Amend Claim Construction Order and revises its construction of "heating element" as simply "an element that heats via resistive heating in order to heat the container by thermal conduction," both the Carta 2 and the Oura have a heating element under

that construction and, therefore, infringe the '334 Patent.  (SUF, ¶¶ 21, 31, 48-50.)

## V.   PUFFCO IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' ANTICIPATION THEORIES

### A.   Defendants Lack Evidence to Meet Their Burden of Proving the "Claimed Invention" was in Public Use Before January 14, 2018.

As the Court previously recognized, in order for Defendants to prevail on their public use invalidity theory, Defendants must prove, with clear and convincing evidence, that the Pepcom Prototypes or prototypes displayed on social media in early January 2018 included each and every limitation of the asserted claims.  (Doc. 45, p. 10)

Here, Defendants lack clear and convincing evidence that the Pepcom Prototypes or prototypes displayed on social media in early January 2018 included several limitations, most notably atomizer that was "removably attachable to the base."

For example, each Puffco employee who was deposed, including the employees with personal knowledge of the Pepcom event and how Puffco built prototypes at that time, testified that the Pepcom Prototypes likely had an atomizer that was hardwired and directly attached to the base.  (SUF, ¶¶ 56-57.)

Puffco's engineer, Roger Sayre, testified that it is "highly likely" that the atomizers of the two Pepcom Prototypes were hardwired to the base.  (SUF, ¶ 57.) He testified that he was responsible for supplying the prototypes, and "[a]t that time I was hard wiring atomizers … we were dealing with issues at the time with the atomizer assembly and its connection points […] so I think it's highly likely" that the Pepcom Prototypes contained atomizers that were hardwired directly to the base and not removable.  (*Id.*) Throughout January 2018, Puffco's engineers did not have a final product, and they were hand-building prototypes in their lab.  (*Id.*) They were hardwiring atomizers directly to the PCB in prototypes due to ongoing electrical

connectivity issues. (*Id.*)

This testimony is corroborated by Puffco's discovery responses and documents produced by Puffco.  (SUF, ¶ 59.)   At the time of Pepcom, Puffco had not received final products from its manufacturer and the Puffco engineers were constructing prototypes out of spare parts and experimenting to resolve known electrical connectivity problems.  (SUF, ¶ 56.)

Conversely, Defendants have failed to put forth any evidence that the Pepcom Prototypes contained a removable atomizer.  Nor can they at trial.  None of the videos, images, and articles referenced in Defendants' invalidity contentions show a removable atomizer.  (SUF, ¶¶ 60-61.)  Further, the Pepcom Prototypes no longer exist, as they were disassembled in the ordinary course of Puffco's design process in 2018, years before this lawsuit.  (SUF, ¶ 55.)  Thus, Defendants cannot possibly meet their high burden to prove anticipation by clear and convincing evidence.

Because Defendants lack evidence to meet their burden, they hope to rely on their experts to opine to the jury that the hardwired atomizer in the Pepcom Prototypes *could* be "removably attachable to the base" under two theories.  Both fail.

Defendants' experts first speculate that *if* the atomizer of the Pepcom Prototype had been hardwired to the base using wires sufficiently long for a user to lift the atomizer out of the receiving well while leaving the hardwired connection in place, *then* such hardwired atomizer is "removably attachable" because it can be placed in and out of the well.  This theory fails for two reasons.  First, Defendants have not examined the Pepcom Prototypes and have no competent evidence regarding the length of the wires in those devices, and, therefore, there is no evidence that one could lift the atomizer completely out of the well.  Dailey-Decl., Ex. F [Kodama] 56:12-15; Dailey-Decl., Ex. E [Hatton], 65:19-21.)  Second, this theory goes against the plain language of the claim limitation and the Court's

construction.  The claims require the atomizer to be "removably attachable" ***to the base***, which the Court construed as "***capable of being detached*** and reattached or replaced with a replacement piece" (emphasis added).  Even if the atomizer could be lifted out of the receiving well it is still physically attached to the base via wires, and therefore by definition the atomizer is not "detached from the base," nor could it be replaced with a replacement piece.

Defendants' experts next speculate that "*if* the […] wires soldered to the atomizer […] were long enough to allow the atomizer to be removed from the recessed region in the base" *then* someone could (1) de-solder and re-solder the wires, or (2) "[a] person of ordinary skill in the art could easily splice connectors into the middle of the wires," and that this technical ability to cut and splice/reconnect the wires, or de-solder and re-solder/reconnect the wires, would make the hardwired atomizer of the prototype removably attachable to the base. (Dailey-Decl., Ex. R,  ¶¶ 155, 247, emphasis added.)  Again, this scenario would require sufficiently long wires, and Defendants lack evidence that the prototypes were so configured.  *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ("The mere fact that a certain thing may result from a given set of circumstances is not sufficient" to prove anticipation.); *see also Apple, Inc. v. Samsung Elecs. Co., Ltd*., 2012 WL 2576136, at *3 (N.D. Cal. July 3, 2012) ("[The expert's] post-hoc, reconstructed interpretation of how a . . . system might have been construed does not constitute prior art for purposes of anticipation.").

Moreover, this would require the Pepcom Prototype to be re-built in order to reattach or replace the atomizer.  One would need to either replace the cut wire between the PCB and the atomizer or resolder the existing wire back to the atomizer.  Defendants are essentially arguing that the prototypes ***could have been*** configured to permit the atomizer to be lifted out of the the base such that the wired connection could be broken and re-connected with tools.  However, "a device does

not infringe [or anticipate] simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech Med. Instrumentation, Inc v. New Image Indus., Inc.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995).

Nowhere in the '334 Patent do the inventors describe "removably attachable" as a process for destroying the operability of the device and then re-building it. To the contrary, the specification expresses that the intended design of the removably attachable components is to "allow a user to ***readily*** remove the mouthpiece [or atomizer] for cleaning and/or ***replacement***" and to allow for "***repeated*** removal and ***re-insertion of the atomizer***." ('334 Patent, at 3:42-55; 4:44-45-50, emphasis added; *see also* 4:53-55)  Nor would the plain and ordinary meaning of "removably attachable" include Defendants' interpretation of breaking and rebuilding. Defendants' expert Kodama admits that removing the atomizer by cutting or breaking the wired connection amounts to destroying the operability of the device until it is repaired.  (Dailey-Decl., Ex. F at 59:18-20 ["[i]f it were indeed hardwired to a PC board, then it would be difficult to completely separate the atomizer"]; 65:8-13 [recognizing that pulling the wires out of the PC board would amount to damaging the unit].)  The Court's construction of removably attachable cannot be read to cover situations where components are ripped out of devices with the device later re-built with wire connectors or soldering tools for operation.  Rather, removably attachable means that the device is purposefully designed to allow the component to be "readily" and "repeatedly" removed and then reattached or replaced.

Defendants' broad view of the Court's construction would render the limitation meaningless because, in the view of Defendants, anything is removable and reattachable.  For example, one's arm could be severed in an industrial accident and reattached using the miracles of modern medicine.  Under the Court's construction, would a person's arm be considered removably attachable?  Clearly

not.  Numerous courts have rejected similar attempts to argue that a component is "removable" because the attachment itself can be broken.  Instead, courts look to the design intent reflected in the patent.  *See, e.g., Neonatal Prod. Grp., Inc. v. Shields*, 2016 WL 1746788, at *9 (D. Kan. May 3, 2016) (rejecting this type of argument and explaining that "anything can be removed if one is willing to destroy the device to remove it. But destruction is not contemplated by the patent's language, and so the Court concludes that the proper construction for 'removable' is 'designed to be removed.'"); *Little Giant Pump Co. v. Diversitech Corp.*, 505 F. Supp. 2d 1107, 1111 (W.D. Okla. 2007) ( "a rivet-made permanent connection is of course not 'infinitely' permanent, because a rivet can be broken" but the "common, ordinary meaning of removable or removably, however, does not include breaking what is meant to be a permanent connection"); *Dorel Juvenile Group, Inc. v. Graco Children's Prods., Inc.*, 429 F.3d 1043, 1044–45 (Fed. Cir. 2005) (affirming district court's conclusion that terms "removably secured" and "removably attached" "carr[ied] with them an implication that the detachment or unsecuring process [does] not do violence to the [product].");  *Prolitec Inc. v. ScentAir Techs., LLC*, 2023 WL 8697973, at *6 (D. Del. Dec. 13, 2023) ("[v]irtually 'anything can be removed if one is willing to destroy the device to remove it  . . . [a]n assembly is removable and replaceable if it is designed for that purpose.").  The same rationale applies here, and the Court should reject Defendants' experts' theories that a hard-wired atomizer is "removably attachable" merely because someone could break the device and then re-connect everything with special tools and parts.

## B.    Kane Does Not Anticipate the Asserted Claims

As an initial matter, Defendants face an even steeper burden than normal when relying on Kane as invalidating prior art.  The PTO reviewed Kane during examination and nonetheless allowed the claims, which include several limitations not disclosed in Kane.  ('334 Patent, at 1.)  Defendants therefore "ha[ve] the added

burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (citations omitted).

Kane describes a water-cooled vaporizing system including a housing assembly with an upper case 26 and lower case 24 (col. 4 lines 28-24), an agitation assembly 40 that includes "a quantity of water 16 in the lower case" (4:43-45) and a plurality of paddles 44 that are submerged in the water (4:45-46.)  (Dailey-Decl., Ex. O [Kane].)  Here are Kane Figures 1, 5, and 7:



The assembly includes an inlet pipe 56 with a bottom end that is submerged in the water. (*Id*., 4:52-65.)  Kane further describes a heating assembly with a vaporizing chamber 58, wherein a heater 70 that is adjacent to the vaporizing chamber "is adapted to heat the vaporizing material through convection … In this manner, the vapors created from the convected material will tumble down the

annular passageway, then down the inlet pipe into the quantity of water." (*Id.*, 5:8-12). Kane further describes an outlet pipe 76 having a bottom end above the water, and a top end coupled to a mouthpiece 78 that can be drawn on to inhale vapors (*Id.*, 5:13-23).

### 1.    Kane Does Not Disclose a Gas Flow Path Conduit.

Kane does not disclose a vaporizer containing "a base having a gas flow path conduit therein […] comprising a conduit inlet and a conduit outlet […] wherein the flow of gas having the vaporizable product entrained therein flows […] through the gas flow conduit inlet of the base to the mouthpiece inlet," as required by the asserted claims. (SUF, ¶¶ 62-63.)

First, as shown in Puffco's co-pending motion regarding Mr. Hatton and Mr. Kodama, Defendants should not be permitted to argue that Kane discloses this limitation because Defendants failed to chart in their Invalidity Contentions "specifically where and how in [Kane]" this limitation "is found." N.D. Cal. PLR 3-3. Nor do their expert reports specifically identify where and how this claim limitation is disclosed in Kane. Defendants should be precluded from making such an argument at trial.

Second, Mr. Walbrink opined that Kane does not disclose a base having the gas flow path conduit, including because Kane does not disclose any discrete physical structure of a channel that flows gas through the base to provide gas from the atomizer to the mouthpiece. (SUF, ¶ 62.) As explained by Walbrink, Kane discloses the use of two separate conduits: an inlet pipe 56 that flows gas from the atomizer to the lower assembly and dumps vapor into water in an open reservoir, and a different pipe, outlet pipe 76, which draws the vapor from the lower assembly into the mouthpiece. (*Id.*) The vapor dumped into the water reservoir exits the water in an uncontrolled manner and accumulates above the water in the lower assembly. Kane describes that the paddles spin and agitate the water (*Id.*, 4:49-51).

Nowhere does Kane disclose or suggest any sort of physical structure to direct or convey the vapor through the water reservoir corresponding to the conduit required by claim 1 and the Court's construction of gas flow path conduit.  (*Id.*)

Further, the final "wherein" clause of claims 1 and 13 requires that the gas flows from the atomizer, through the gas flow path conduit inlet to the mouthpiece inlet.  The Court construed the final "wherein" clause as a required "capability of the vaporization device."  (Doc. 65, at 22.)  In Kane, the vapor flows from the vaporizing chamber to an intermediary component – the "water reservoir" – where "spinning paddles agitate and percolate the water in the reservoir."  (Kane, 1:21-23.) Because Kane does not disclose a device wherein the gas flows from the atomizer internal flow path "through the gas flow conduit inlet of the base to the mouthpiece inlet," it does not anticipate.

The parties anticipated this issue and discussed it with the Court during the *Markman* Tutorial:

> "MR. CROWE: They have a piece of prior art [Kane] where the gas is generated in an atomizer, let's say.  It goes into a barrel of water and then comes out as something different.  That barrel of water is not a conduit through the base because it is adding other elements to the gas mixture."

> "THE COURT:  Well, you know, I could understand that. . . . I mean, there would be a distinction between the patent – this patent and a situation where there would be some sort of intermediary between the gas."  (Transcript of Tutorial, pp. 15-16)

Kane discloses just what the Court said – an intermediary component (the water reservoir) interrupting the flow of gas completely lacking any channel structure.  (SUF, ¶ 62, citing Walbrink Val. Rep., ¶ 127.)

## 2.    Kane Does Not Disclose a Heating Element.

Kane does not expressly or inherently disclose "an atomizer […] comprising […] a heating element capable of heating the vaporizable product held in the container, the heating element being configured to be electrically connected to the

one or more components for electrically connecting to the power source and/or controlling the device that are housed in the base."  (SUF, ¶¶ 64-65.)

First, Defendants' Invalidity Contentions only identified one component in Kane as disclosing a heating element – "heater 70."  (Dailey-Decl., Ex. T [Invalidity Contentions, Appendix B], at p. 12.)  However, "heater 70" cannot equate to the "heating element" because it is not part of the alleged removable atomizer (*i.e.*, the vaporizing chamber 58, shown in Figs. 1 and 4 and in its entirety in Fig. 7). Defendants' technical experts fail to opine that the heater 70 is part of the alleged removable atomizer as required by claim 1.  Mr. Hatton admits that the heater 70 is not part of the removable vaporizing chamber 58.  (SUF, ¶ 64.)  And Mr. Kodama is just unsure of whether the heater 70 is part of the vaporizing chamber. (*Id.*, citing Kodama Depo., 75:15-18 (admitting heater 70 is separate from the vaporizing chamber); 77:3-7 ("[i]t's unclear whether [heater] 70 is part of that [heating] assembly or part of the base"); and 87:13-18) (admitting it is unclear of whether heater 70 is part of the removable component). Such testimony falls far short of the clear and convincing standard required to be met by Defendants to prove invalidity.

Second, neither of Defendants' experts provided any opinion as to how the limited disclosure of a "heater 70" meets the Court's claim construction of "heating element" as "a metal or ceramic plate attached to conductive elements, such as wires."  (Doc. 65, p. 26)

Recognizing that the only theory disclosed by Defendants fails, Defendants' experts attempt to switch theories and pointed to the heating coils 65 of Kane as disclosing the "heating element" limitation.  Puffco has filed a motion to strike these portions of Defendants' experts' reports as untimely.  Even if permitted to switch theories this late, Defendants' new assertion still fails.  First, Kane fails to expressly disclose that the heating coils 65 are configured to be electrically connected to a component in the base that provides power.  (SUF, ¶ 66.)  And, disclosing "heating

coils" within an atomizer, with nothing more, does not mean that the heating coils 65 are attached to a source of power.  (SUF, ¶ 67.)

Second, Kane fails to disclose that its heating coils 65 are "attached to conductive elements such as wires."  (SUF, ¶¶ 68-69.)

Third, Kane does not describe the material or shape of the heating coils 65. Defendants' experts admit that Kane fails to disclose that its heating coils 65 are in the form of a plate.  (SUF, ¶ 70.)

For all these reasons, Mr. Walbrink opined that Kane does not disclose the heating element limitation as construed by the Court.  (SUF, ¶ 65.)  Specifically, Mr. Walbrink opined that Kane does not disclose the heater 70 as part of the removable heating assembly (Dailey-Decl., Ex. O, ¶ 161), that Kane does not disclose or suggest that the heater 70 or heating coils 65 could be in the shape of a plate (*id*., ¶ 160) and that Kane does not disclose its heating coils 65 as being electrically connected to a power source but, rather, at best, indirectly heated by the heater 70 (*id*, ¶ 163), something that Defendants' experts agree with.  (SUF, ¶ 65-66.)

### 3.    Kane Does Not Disclose a "Mouthpiece that is Removably Attachable to the Base"

Mr. Walbrink, opined that Kane does not disclose a mouthpiece that is removably attachable to the base.  (SUF, ¶ 69.)  Kane only describes the mouthpiece as being "coupled" without more, which a POSITA would understand to mean affixed.  (SUF, ¶¶ 72-73.)  In Kane, the inventor uses the term "coupled" to describe a connection of two components that is intended to be permanent: "The rigid intermediate plate is coupled to the upper case" (Kane, at 4:38-40), "[a]n anti-skid pad 36 is coupled to the lower case from below to prevent slipping" (Kane, at 4:41-42), "[a] drive shaft 50 couples the motor and the plurality of paddles" (Kane, at 4:48-51), and "[a] mouthpiece 78 is coupled to the top end of the outlet" (Kane, at 5:21-22).  When the inventors intended to connote a removable coupling, they did

so.  "Upper screw threads 68 <u>removably couple</u> the heating assembly to the upper case."  (Kane, 5:1-2.)

Further, Kane does not disclose a mouthpiece inlet "capable of being placed in communication with the conduit outlet of the base upon attachment of the mouthpiece to the base, to receive a flow of gas into the mouthpiece from the base." ('334 Patent, 14:3-7.)  In Kane, the mouthpiece receives gas from the water reservoir.  (Kane, 5:13-23).

Thus, Kane does not disclose a removably attachable mouthpiece.

## VI.   <u>CONCLUSION</u>

For the reasons above, Puffco respectfully requests the Court grant Puffco partial summary judgment on infringement and no anticipation by public use or Kane.


Dated:  February 8, 2024          **BRYAN CAVE LEIGHTON PAISNER LLP**


By:   <u>*/s/ Colin D. Dailey*</u>
       Colin D. Dailey
       Attorneys for Plaintiff Puff Corp.


### L.R. 11-6.2. Certificate of Compliance

The undersigned, counsel of record for Plaintiff Puff Corp., certifies that this brief contains 6,991 words, which complies with the word limit of L.R. 11-6.1.  In making this certification, the undersigned has relied on the word count of the word-processing system used to prepare the document.


Dated:  February 8, 2024          **BRYAN CAVE LEIGHTON PAISNER LLP**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:   /s/ Colin D. Dailey
Colin D. Dailey
Attorneys for Plaintiff Puff Corp.